FILED

03/25/2026

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 2, 2025

## MARTERIOUS O'NEAL v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 15-04917       Paula L. Skahan, Judge**

_____

### No. W2025-00175-CCA-R3-PC
_____

The Petitioner, Marterious O'Neal, was originally convicted of two counts of felony murder, eight counts of attempted aggravated robbery, and one count of aggravated assault, for which he received an effective sentence of life imprisonment. He filed for post-conviction relief, alleging various grounds of ineffective assistance of trial and appellate counsel including (1) trial counsel's failure to file a motion under Rule 608 of the Tennessee Rules of Evidence to impeach a witness for the State, (2) appellate counsel's failure to include the transcript of the motion to suppress on direct appeal; and (3) appellate counsel's failure to withdraw from representation in compliance with Rule 14 of the Tennessee Supreme Court thereby depriving the Petitioner of a timely application to appeal pursuant to Rule 11 of the Tennessee Supreme Court. Following a two-day evidentiary hearing, the post-conviction court granted a delayed appeal upon finding that appellate counsel had failed to withdraw in compliance with Rule 14, thereby depriving the Petitioner of the ability to file a timely Rule 11 appeal to the Tennessee Supreme Court. In the same order, the post-conviction court determined that whether trial counsel was ineffective in failing to file a Rule 608 motion had been previously determined by this court and that the Petitioner had failed to establish prejudice with respect to appellate counsel's failure to include the motion to suppress transcript on direct appeal. In this appeal, the Petitioner contends, and we agree, that the post-conviction court erred in determining that the Rule 608 issue had been previously determined and in granting a delayed appeal to the Tennessee Supreme Court. With respect to the remaining issues, the Petitioner also contends that the post-conviction court erred in finding that he received the effective assistance of trial and appellate counsel. Although appellate counsel failed to withdraw in accordance with Rule 14, we conclude that appellate counsel filed a timely application for permission to appeal from the Petitioner's convictions in this case. Accordingly, we reverse and vacate the order of the post-conviction court to the extent that it grants the Petitioner a delayed appeal. We also conclude that because the Petitioner's Rule 608 claim challenges trial counsel's failure to file the motion rather than the trial court's denial of the same, this issue has not been previously determined by this court. Nevertheless, the Petitioner failed to establish that trial counsel's decision in not filing a Rule 608 motion

prior to trial was ineffective.  Finally, we conclude that trial counsel's failure to include the transcript of the motion to suppress on direct appeal was deficient; however, the Petitioner failed to establish prejudice.  Accordingly, we affirm the judgment of the post-conviction court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and JILL BARTEE AYERS, J., joined.

Rosalind Brown, Memphis, Tennessee, for the appellant, Marterious O'Neal.

Jonathan Skrmetti, Attorney General and Reporter; Ryan W. Davis, Assistant Attorney General; Steve Mulroy, District Attorney General; and Theresa McCusker, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A full recitation of the facts supporting the Petitioner's convictions may be found in this Court's direct appeal opinion at State v. O'Neal, No. W2019-02157-CCA-R3-CD, 2021 WL 3047340 (Tenn. Crim. App. July 20, 2021).  The brief facts giving rise to the Petitioner's convictions stem from an October 4, 2014 shooting at a home in Memphis that killed two victims and injured two victims.  Id. at *1.  The Petitioner was developed as a suspect and later provided a full statement confessing to his involvement in the fatal shooting.  As relevant to the issues raised in this appeal, the proof at the Petitioner's trial established the following:

> MPD Sergeant Eric Kelly, who acted as the lead investigator in this case, testified that when he arrived at the Gherald Street residence, "there were four, actual wounded victims" and "a total of nine males that were the victims of an attempted robbery and they had been shot at."  Three of the wounded victims were transported to the Regional One Medical Center, and the body of the fourth victim was transported to the medical examiner's office.  Over the course of his investigation, Sergeant Kelly identified the [Petitioner] and the co-defendant, Antwon Young, as suspects in the shooting.  He also learned that a third person, Austin Yewell, may have had some involvement in the crime.
>
> Sergeant Kelly interviewed the [Petitioner] with regard to the offenses, and the [Petitioner]'s statement was read into the record.  In his

statement, the [Petitioner] said that his older cousin, "Nuke," whose given name was Antwon Young, was responsible for the shooting on Gherald Street. The [Petitioner] said that, during the shooting, he was armed with a .45 caliber handgun and that Mr. Young was armed with a .38 caliber revolver that he had gotten from Mr. Yewell. The [Petitioner] said that on October 4, 2014, the three men were at the [Petitioner]'s grandmother's house when Mr. Yewell showed them the guns and said that he had no clip for the .45 caliber handgun. Mr. Young asked Mr. Yewell how much a clip would cost, and Mr. Yewell told Mr. Young that "he would pay for one if he went to get it." Mr. Young directed the [Petitioner] to telephone "Guns and Ammo on Summer and ask how much for an extended clip and ammo for it to see how much it cost." The [Petitioner] said that after he told Mr. Young and Mr. Yewell what he had learned with regard to the cost of a clip and ammo, Mr. Yewell gave Mr. Young "like ninety, a hundred dollars," but Mr. Young told them that he could not get the clip and ammunition "because he has a felony, so he asked Melvin [Wiggins] to go buy it and I got in the back seat of Melvin's car and rode with him, to play with the baby." The [Petitioner] said that after Melvin purchased the items, they returned to the [Petitioner]'s grandmother's house "and got the stuff out and gave it to Nuke to make sure it fit. Nuke took it and said that it did fit."

The [Petitioner] told Sergeant Kelly that, later that same day, the [Petitioner], Mr. Young, and Mr. Yewell went "riding around." The [Petitioner] said that they "just rode around and listened to music. We rode around a bend in the road and we passed this group of Mexicans and when we got to the corner Nuke told Austin to turn left and stop at the next corner." "Nuke got out and he had both of the guns and my phone, so I got out and I went to catch up with him. I walked with him and I was listening to my music." The [Petitioner] said that, as he and Mr. Young "got closer to the Mexicans he told me to hold the .45 gun. When we got closer he said if they do anything if I shoot you shoot. If you don't we gone [sic] to have a problem." The [Petitioner] claimed that Mr. Young "had a reputation for beating people. I watched him beat his baby mamma with a gun in his hands, so I was scared." The [Petitioner] told Sergeant Kelly that Mr. Young "shot up in the air and demanded them to get on the ground." The [Petitioner] said that those men closest to Mr. Young got to the ground while one of the men ran toward the [Petitioner] and then back toward the house. Mr. Young told the [Petitioner] to search the men who lay on the ground, and the [Petitioner] "put my hand on his back and acted like I was doing it and the guy looked up to me like he was asking me for help." At that point, the front door of the house opened, and Mr. Young "went towards it. He started shooting. He

- 3 -

was shooting towards the front door, then he was shooting towards the ones running down the side of the house." Mr. Young "looked back at me and told me to shoot. I held the gun up and closed my eyes and shoot it a couple of times and ran off." The [Petitioner] said that Mr. Young followed him, angry that he had not searched the men. Mr. Yewell pulled up, and the [Petitioner] and Mr. Young got into Mr. Yewell's van. The [Petitioner] told Sergeant Kelly that Mr. Young said that "he shot some of the dudes. He said that the dude that came to the door he shot him in the chest." Mr. Young then directed Mr. Yewell to drive him to Mr. Young's grandmother's house. Mr. Young kept both of the guns. On the following day, Mr. Young told the [Petitioner] that he had seen on the news that the two men he had shot had died. A few days later, Mr. Yewell came and got the .38 caliber handgun from Mr. Young so that he could sell it, but Mr. Young kept the .45 caliber handgun.

Sergeant Kelly testified that the [Petitioner] identified a photograph of Mr. Young. On the back of the photograph, the [Petitioner] wrote:

> This is my cousin, Antwon Young, Nuke. On the day of the shooting I wasn't aware that this was about to happen. We was just driving around, me, Austin and Nuke. Nuke was in the backseat of Austin's grandmother's car, van. We drove past the house and when we got to the corner Nuke told Austin [sic] to the left and he did.

> Nuke said stop right [sic] and he got out and had both guns. I just got out because he had my phone. Austin pulled off. I got my phone and was listening to music and we walked. When we got close Nuke said hold this gun, the .45, then he was holding a .38 that Austin let him see.

> There were a lot of people out there. Nuke said if they try something and I shoot, you shoot. If you don't we're going to have a problem. I didn't expect this. I didn't know this was going to happen.

> Nuke shot in the air and told them to get on the ground. He made the ones in the front do it, the others ran. One came towards me, one came toward the street side where I was when he ran back behind the house. Nuke told me to search them but I didn't. I put my hand [on] one guy's back, he looked at me

- 4 -

for help.  But the [door] opened -- and Nuke started shooting and yelled at me to shoot.

I held the gun in the air and shot a few times but not at anyone, then I ran.  Nuke came after me, he was very upset because I didn't search them.  And he got to the next street I seen [sic] Austin in the van.  I ran and jumped in the front.  Nuke got in the back.  He was just talking about he shot some people, one in the chest.  I said you shot someone?  Nuke said yes.  Nuke said take him to my grandmother's house.

During cross-examination, Sergeant Kelly said that the [Petitioner] gave an initial version of events during the interview that Sergeant Kelly classified as "not factual" but that he "ultimately" provided "a somewhat factual statement in regards to" the Gherald Street shooting.  Sergeant Kelly reiterated that the [Petitioner]'s first version of events "wasn't totally consistent" with the known facts and evidence.  In the first version, the [Petitioner] "admitted to participating but he didn't admit his full participation, and he had extra people that actually weren't there."  Sergeant Kelly added, "He told a story which was not completely factual and left hisself [sic] out of doing certain things like pulling a trigger on a double murder."

During redirect examination, Sergeant Kelly testified that the interview room was not set up for video recording interviews but that, once the [Petitioner] began to provide "factual information," Sergeant Kelly tried to record the [Petitioner] with his cellular telephone to capture "how casual and callous he was explaining" the circumstances of the shooting "because I wasn't going to be able to really articulate it in words."  Sergeant Kelly recalled that the [Petitioner] "actually got up and drew out on the chalkboard" the location of the victims and the street and "how they walked around and basically stalked the victims and ran up on them and commenced doing what they ended up doing."  Sergeant Kelly said that he "couldn't believe how it was unfolding so I decided to record it."

O'Neal, 2021 WL 3047340, at *3-4.

As previously noted, the jury convicted the Petitioner of two counts of felony murder, eight counts of attempted aggravated robbery, and one count of aggravated assault, for which he received a total effective sentence of life imprisonment.  Following his

convictions, the Petitioner filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal.

On direct appeal, the Petitioner argued *inter alia* that "the trial court erred by denying his motion to suppress the pretrial statement he provided to the police . . . and by limiting his cross-examination of a State witness." Id. at *1. Regarding the suppression issue, this court determined the following:

> Prior to trial, the [Petitioner] moved to suppress his pretrial statement to police on grounds that Sergeant Kelly unconstitutionally continued to question the 17-year-old [Petitioner] outside the presence of his mother and in the absence of counsel even after he specifically and repeatedly asked for the assistance of both. No transcript of the hearing on the [Petitioner]'s motion appears in the record on appeal. In the written order denying the motion to suppress, the trial court found that officers did not coerce the [Petitioner]'s statement. The court concluded that the [Petitioner] was provided with Miranda warnings and that he executed a written waiver of his constitutional rights before giving his statement. The court accredited the testimony that the [Petitioner] did not ask to terminate the interview and did not request an attorney at any point. The court found that no evidence supported the [Petitioner]'s assertion that he provided statements solely because he thought that he would be a witness and would not be charged. Ultimately, the court determined that the totality of the circumstances established that the [Petitioner]'s statement was voluntary.

> As the State correctly points out, although the [Petitioner] makes references to a transcript of the motion hearing, no such transcript appears in the appellate record in this case. Without the transcript, we cannot evaluate the propriety of the trial court's ruling. The appellant bears the burden of preparing an adequate record on appeal, see State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993), which record "shall consist of ... the original of any exhibits filed in the trial court," Tenn. R. App. P. 24(a). If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. See State v. Richardson, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). In the absence of the transcript of the hearing on the [Petitioner]'s motion to suppress, we must presume that the trial court correctly denied the motion.

O'Neal, 2021 WL 3047340, at *7.

The Petitioner also asserted that the trial court erred by limiting his cross-examination of Sergeant Kelly, the lead investigator, arguing that "he should have been permitted to question the detective about Sergeant Kelly's disciplinary hearing." Id. at *8. In rejecting this issue, this court reasoned as follows:

In reply to a question posed on cross-examination, Sergeant Kelly said that he had "only gone through the required Sergeant training. My interview skills and technique come from years of being on the streets and from what my parents taught me about how to treat people." At that point, the [Petitioner] argued that Sergeant Kelly's response had opened the door to his being cross-examined about having "been suspended and even terminated for assaulting and attacking suspects." The State argued that the [Petitioner]'s statement was "a huge mischaracterization of Officer Kelly's disciplinary record" and that "almost everything that would come even remotely close to anything of that nature is twenty years old and has nothing to do with doing an interrogation." According to the prosecutor, one incident occurred in January 1998, and another occurred in June 1997. The State argued that the disciplinary records were hearsay and that, if the [Petitioner] had wanted to question Sergeant Kelly about any specific instance of conduct that led to his being disciplined, he should have provided sufficient pretrial notice under Tennessee Rule of Evidence 608. The State also argued that the proof of any such acts would have to come firsthand from witnesses and could not come via the disciplinary records. The State noted that, had it been given proper notice, a full hearing could have been had. The State argued that "if this is for impeachment purposes it is past ten years" and asserted that, although the [Petitioner] "gave me notice of one event," he only gave me little snippets of facts, not the stuff where I could have the witnesses, so it is not meaningful notice." The State asserted that the age of the acts and their probative value for truthfulness did not satisfy the requirements for admission under Rule 608. The trial court observed that the issue should have been presented "ahead of time so I can consider all of this information, take it under advisement and issue a ruling." The [trial] court ruled that Sergeant Kelly's statement "that he learned how to treat people by the way he was raised by his parents" did not open the door to anything because "we don't know how his parents raised him. So I really don't know what that means." The [trial] court concluded that it did not open the door to "his credibility for truthfulness" and that "[e]ven if it did under 608 you have to give notice for a specific instance of conduct." The [trial] court noted that the State was also entitled to "sufficient advance notice of the intent to use this evidence as provided so that they may contest the use of such evidence" in a hearing. The court found that given the State's strong objection to the

- 7 -

evidence, "we'd have to have probably a couple of days hearing on this and we just can't do that right now." The [trial] court permitted the [Petitioner] to enter the records for identification only as an offer of proof.

. . . .

In our view, the trial court did not err by barring cross-examination of Sergeant Kelly with specific instances from his disciplinary record. First, the [Petitioner] did not provide the State with sufficient notice of his intent to use the evidence. Second, the [Petitioner], as the proponent of the evidence, should have, but did not, request a hearing to determine the admissibility of the evidence. See State v. Philpott, 882 S.W.2d 394, 404 (Tenn. Crim. App. 1994). Third, the procedural default notwithstanding, the instances of conduct themselves do not satisfy the requirements for admission under Rule 608 because they were more than 10 years old and were not probative of Sergeant Kelly's character for truthfulness.

O'Neal, 2021 WL 3047340, at *8-9.

This court affirmed the judgments of the trial court. Id. at *9. The judgment on direct appeal was entered on July 20, 2021, and no petition to rehear was filed. Accordingly, the Petitioner had 60 days—until September 18, 2021—to file a Rule 11 application. See Tenn. R. App. P. 11(b) (noting that a Rule 11 application "shall be filed with the clerk of the Supreme Court within 60 days after the entry of the judgment of the . . . Court of Criminal Appeals if no timely petition for rehearing is filed[.]" Because September 18, 2021, was a Saturday, the deadline extended to the next business day, Monday, September 20, 2021. See Tenn. R. App. P. 11(b), Adv. Comm'n Cmt (noting that "should the sixtieth day fall on a weekend or holiday, the application for permission to appeal could be filed on the next business day"); see also Tenn. R. App. P. 21(a) (same). That same day, September 20, 2021, the public case history report shows that appellate counsel filed an application for permission to appeal to the Tennessee Supreme Court, which was denied by order on November 19, 2021. Order, State v. O'Neal, No. W2019-02157-SC-R11-CD (Tenn. Nov. 19, 2021).

On May 5, 2022, the Petitioner filed a pro se petition for post-conviction relief arguing that he received ineffective assistance of counsel at trial and on appeal. The pro se petition referenced "Docket No. 15-04917" and later listed the same number for the case number for the Petitioner's underlying convictions. For the "offense convicted of" section, the Petitioner listed "First Degree Murder x2, Crim-Attempt Aggravated Robbery x8, Aggravated Assault, Crim-Attempt Especially Aggravated Robbery." As relevant to this appeal, the Petitioner alleged that trial counsel was ineffective in failing to "file [a] motion

- 8 -

sufficient during pretrial under Tennessee Rule of Evidence 608, to question Sergeant Kelly['s] disciplinary record[,]" and in failing to withdraw as counsel which "forbid [P]etitioner[] to file for review under Tenn. R. App. Proc. 11(d) permission to appeal to the Tennessee Supreme Court."

On May 10, 2022, the post-conviction court appointed counsel, who later withdrew from representation on February 27, 2023, due to a conflict of interest arising from a change in employment. The orders appointing post-conviction counsel and permitting post-conviction counsel to withdraw were for case number 15-05135, case number 15-04917, and two illegible case numbers were referenced on the order allowing post-conviction counsel to withdraw.[1]

On March 1, 2023, the post-conviction court appointed current post-conviction counsel and the court's order reflected only case number 15-04917. On April 13, 2023, counsel filed an amended petition under the same number incorporating all grounds alleged in the pro se petition [I, 21-22]. In addition, the amended petition alleged that trial counsel failed to "give proper notice of evidence that would have impeached the testimony of Sergeant Kelly . . . involving misconduct by the witness in his official duties." The amended petition also purportedly attached the transcript from the motion to suppress that was not included in the record on direct appeal. On September 18, 2023, post-conviction counsel filed a second amended petition also under the same number incorporating the prior petitions and, alleging that trial counsel was ineffective for failure to "investigate Sergeant Eric Kelly for the purposes of impeachment when he was aware that the Sergeant was under investigation for misconduct." The State filed a written motion denying the allegations contained in the petition.

The post-conviction court conducted a two-day evidentiary hearing on January 12, 2024, and April 2, 2024. It should be noted that the transcript from the post-conviction hearing lists two trial court case numbers: 15-04917 and 15-05135, and the hearing purportedly combined the proof for both cases. The testimony relevant to the issues raised in this appeal is outlined below.

The Petitioner testified that, in his pro se petition, he raised "several" issues concerning trial counsel's failure to provide him effective assistance of counsel both at trial and on appeal. The Petitioner asserted that trial counsel failed to include the transcript of the suppression hearing in the appellate record, and, as a result, "the Court of Appeals

---

[1] For trial court number 15-05135, not at issue here, the Petitioner was convicted of the especially aggravated kidnapping and aggravated robbery of a Domino's Pizza delivery man. State v. O'Neal, No. W2019-02155-CCA-R3-CD, 2021 WL 1832148 (Tenn. Crim. App. May 7, 2021). On direct appeal, this court affirmed the sufficiency of the evidence supporting the Petitioner's convictions but remanded for imposition of sentences as a Range I, standard offender.

- 9 -

refused to hear [the] suppression issue." The Petitioner also opined that trial counsel failed to inform him of the direct appeal decision, which caused the Petitioner to miss the deadline to file a Rule 11 application. He said the jail records would have shown had he received a letter from trial counsel; and because they did not, he implied trial counsel never sent him a letter asking whether he wished to seek a Rule 11 appeal. The Petitioner denied any such letter existed. The Petitioner further stated that trial counsel failed to adequately investigate Sergeant Kelly, despite having "[p]lenty of time" before trial to do so and to provide notice of his intent to impeach. The Petitioner stated that he asked trial counsel to investigate Sergeant Kelly because Sergeant Kelly "wasn't doing things the proper way and that they -- he coerced my [pretrial] statement." The Petitioner said,

> Every time I brought up Sergeant Kelly it was always put on the back burner, oh, we'll worry about that another time or something like that. But I can't remember exactly when the private investigators came and talked to me and I asked them about it and they're the ones that enlightened me to [Sergeant Kelly's] background. And if that was before the suppression hearing I can't remember or was it before the trial.

Trial counsel testified that he represented the Petitioner at trial and on appeal. He became aware of the Petitioner's concern with Sergeant Kelly when the Petitioner discussed the circumstances surrounding his confession. Trial counsel explained that he filed a motion to suppress the Petitioner's statement when it "became clear that we were moving forward in a trial setting." Trial counsel stated that he questioned Sergeant Kelly at the suppression hearing regarding his use of "colorful language" during interrogations and other instances of alleged misconduct. When asked if Sergeant Kelly's testimony made him think that he needed to further investigate Sergeant Kelly's conduct, trial counsel stated,

> I had already investigated him at that point. I had a private investigator at that point on the case. They had obtained a full copy of his personnel file at that point in time and we had obtained all the information that was available to us at the point of that hearing.
>
> . . . .
>
> [I]n his personnel file he had prior complaints, ranging from in one instance there was an allegation that he assaulted a suspect in the back of a car; one instance he had some kind of Mickey Mouse write-ups; one instance he was actually let go from his job at the Memphis Police Department but he filed an appeal and that was reversed.

- 10 -

Trial counsel stated that he did not give notice to use Sergeant Kelly's personnel file for impeachment because every complaint occurred more than ten years prior to the time of the Petitioner's confession. Trial counsel stated that he, nevertheless, brought the file with him to trial "in case [he] needed it." He stated, "if [Sergeant Kelly] opened the door, [] I had every right and intention of planning to use it." Trial counsel said that, at trial, he questioned Sergeant Kelly about his interrogation techniques and where he learned to talk people. Trial counsel said that Sergeant Kelly's response was that he was "just raised right" and "he knows how to treat people." Trial counsel then attempted to introduce the personnel file, arguing that Sergeant Kelly "testified under oath that he knows how to treat people right[,] but we have these other issues in the past now where he clearly according to his personnel file had not been treating people right." Trial counsel explained that "a very extensive hearing" was conducted in court in which the trial court "at one point was leaning towards granting it and then ultimately decided because it was just so old that it wouldn't be proper to come in."

Trial counsel further testified that, at the time of appeal, he hired another attorney as an independent contractor to write the Petitioner's direct appeal for him. Trial counsel stated that at some point he received notice that the appellate record was missing the transcript from the motion to suppress hearing. He said that he notified the independent contractor about the missing transcript and the independent contractor said he "would take care of it." Trial counsel stated, "that was the last [he] heard of it." Asked would he be surprised to know that post-conviction counsel received the appellate record and that it contained "transcripts three and four and that they were there and [the independent contractor] could have cited those transcripts," trial counsel said he was not surprised because he believed the matter had been taken care of. Based on this exchange, trial counsel believed the independent contractor who wrote the brief had sent the transcript of the motion to suppress to this court. Trial counsel acknowledged that although the independent contractor assisted with the appeal, trial counsel was "ultimately responsible" for it.

Asked to respond to the Petitioner's complaint that trial counsel never informed him of this court's denial of his direct appeal, trial counsel said that his standard practice was to write his clients a letter to let them know that the appeal had been denied and to advise them that they had 60 days to appeal from that decision should they choose to do so. Trial counsel was unfamiliar with any rule which required him to seek approval from this court before withdrawing from representing a client. On cross-examination, trial counsel confirmed that he was familiar with Rule 608 and agreed that it allowed the trial court to consider behavior that occurred within ten years of the Petitioner's statement. Trial counsel insisted that there was a separate motion hearing regarding Sergeant Kelly's disciplinary records before they had scheduled the Petitioner's case for trial. Trial counsel affirmed that he received the information concerning Sergeant Kelly's disciplinary record prior to

trial.   On redirect examination, trial counsel was asked if he was familiar with the requirement of Rule 14 of the Tennessee Supreme Court for all appointed attorneys to file a motion and seek permission from this court in order to withdraw from representation of an indigent party.   In response, trial counsel said that when he would send letters to his clients about the denial of their appeal, he was not seeking to withdraw from their case.   He said he was asking them if they wanted to seek an appeal pursuant to Rule 11.   Based on his standard practice, trial counsel assumed he sent the Petitioner a letter advising him of the denial of his appeal and of his other appellate options.   Trial counsel said he did not receive a response from the Petitioner.   Trial counsel insisted that he did not file a Rule 11 application for permission to appeal in this case.

On cross-examination, trial counsel said that, even if the Petitioner's statement was suppressed, the Petitioner still could have been convicted based on the other evidence at trial.   Trial counsel explained that the video recording of the Petitioner's interrogation, the Petitioner's signed statement that included his Miranda rights, and the testimony of both former co-defendants likely would have been sufficient for a conviction.   Trial counsel further testified that there was no other way to investigate Sergeant Kelly beyond obtaining Sergeant Kelly's personnel file.   Trial counsel explained that the investigators he hired were "motivated to find anything that could help" because "[t]hey felt bad for [the Petitioner] and they wanted to do everything they could to try to help him because he was so young at the time."

After hearing the above testimony and reviewing the suppression hearing transcript, the post-conviction court filed a written order denying the petition.   The order provided, in relevant part, as follows:

> The [P]etitioner alleges that trial counsel failed to file a motion sufficient, during pre-trial under Tennessee Rule of Evidence 608, to question and impeach Sergeant Kelly.   A pretrial suppression hearing was held, and the trial court ruled that the impeachment evidence could not be used.   The trial court also allowed for the statements Petitioner made to Sergeant Kelly to be used in the trial, not seeing sufficient evidence to prove that they were coerced.   The matter was raised again on appeal, and the [C]riminal [C]ourt of [A]ppeals ruled that although there was no notice under 608, even if the proper notice had been given the evidence being offered was more than 10 years old and not probative of Kelly's character for truthfulness. . . . Therefore, this matter has already been ruled upon by the criminal court of appeals and requires no further ruling from this court.

. . . .

Petitioner alleges that his counsel failed to provide appropriate references to the record and attach transcripts pursuant to Tenn. R. App. 24(e) of the suppression hearing for review by the appellate court.

. . . .

The transcripts of the motion to suppress, held on March 3, 2017, were not received by the [C]ourt of [A]ppeals. The Criminal Court of Appeals states in its judgment that "the defendant waived consideration of this issue by failing to provide an adequate record for review." State v. O'Neal, W2019-02157-CCA-R3-CD 10 (March 2021). "No transcript of the hearing on the defendant's motion appears in the record on appeal." . . . . The transcripts were not submitted, and the Court of Appeals did not receive them. The error made was significant and obvious because the Court of Appeals denied the issue citing the lack of transcripts. [Trial counsel] did acknowledge that an error was made, "Q: So [the other attorney] wrote it? A: Yes. Q: But you signed it? A: Yes. Q: So that would make you ultimately responsible for what he did? A: Absolutely." There really was no justification presented beyond what is stated above, a mistake was made and as the attorney on record [trial counsel] was responsible for making sure the transcripts got to the Court of Appeals.

The error, however, did not prejudice the outcome of Petitioner's trial. The trial court denied Petitioner's motion to suppress statements that he gave to the police on March 23, 2015. The statements placed Petitioner at several of the incidents in question and showed his role in the crimes. Petitioner, however, did not exhibit the behavior of someone who did not wish to speak to the police. He gave five different statements in total and was Mirandized twice. The state submitted into evidence the paperwork for the second time Petitioner was Mirandized. (citation omitted). It had his initials on each page and his signature at the bottom. All of the statements Petitioner gave were typed and then reviewed by him. Had Petitioner not wanted to speak with the police he simply would have remained silent. There is also a video [Sergeant] Kelly took of Petitioner animatedly drawing diagrams on a white board to help illustrate his statement. The motion to suppress the statements were properly denied by the trial court and were unlikely to be granted by the criminal court of appeals. It is also unlikely that even if the motion to suppress had been granted that it would have changed the outcome of Petitioner's trial. There was other evidence and witnesses that put him at the incidents in question. Therefore, the error made by Petitioner's counsel . . . did not prejudice the outcome of his trial. This court cannot rule if the Criminal Court of Appeals would have found prejudice and the counsel to be

- 13 -

ineffective. Because the Criminal Court of Appeals only had the trial transcripts this court recommends that motion to suppress transcripts be included to go up on appeal when filing to the Tennessee Supreme Court.

. . . .

By statute, court-appointed attorneys are not required to file an Application for Permission to Appeal to the Supreme Court on behalf of their clients. (T.C.A. § 40-14-203). However, appointed counsel must comply with Rule 14. Counsel must file a motion to withdraw within 14 days of the Court of Criminal Appeals' entry of final judgment. (Tenn. Sup. Ct. R. 14). The motion shall be accompanied by a copy of the written notification forwarded to the [Petitioner] which shall advise the [Petitioner]: (1) that counsel does not intend to file an Application for Permission to Appeal and that leave of Court is being sought to withdraw; (2) that the [Petitioner] may file a pro se Application for Permission to Appeal with the Clerk of the Supreme Court if filed within sixty days after entry of final judgment in the Court of Criminal Appeals; (3) the date on which the Court of Criminal Appeals opinion was released; and (4) the date on which an Application for Permission to Appeal is due. Id. Petitioner's counsel, [], never filed such a motion, nor was any written notification ever sent or received by Petitioner. "Absent an order allowing counsel to withdraw, a court-appointed attorney must file an application for permission to appeal to the Tennessee Supreme Court." (Tenn. Crim. Trial Practice § 31:16).

Petitioner alleges that trial counsel provided ineffective assistance of counsel on direct appeal when he failed to withdraw as counsel pursuant to Tenn. R. App. Proc. 14. Since counsel did not withdraw Petitioner was unable to file for a review under Tenn. R. App. Proc. 11(d). Counsel stated that it was his standard procedure upon receipt of the court of appeals decision to send a letter informing the client of the decision and asking if they wanted to file an appeal. (citation omitted). Counsel states that he did so and did not hear back from his client, he thus did not file an appeal. Petitioner states that he received no such letter citing the jail procedure that makes inmates have to sign for any legal mail they receive. (citation omitted). Counsel provided no proof that any such letter was sent or received by the jail. The Tenn. R. App. Proc. 11(d) appeal did not get filed within the time limit after the criminal court of appeals rendered its judgment.

This Court finds that Petitioner is entitled to file a delayed Application for Permission to Appeal to the Tennessee Supreme Court.

. . . .

For the reasons stated above, Petitioner has failed to prove that he is entitled to postconviction relief for ineffective assistance of counsel at trial. However, this court feels that Petitioner is entitled to second-tier appeal relief due to ineffective appellant counsel. This Court finds that Petitioner is entitled to file a delayed application for permission to appeal to the Tennessee Supreme Court. This court also orders that the record be supplemented with the motion to suppress hearing transcripts.

It is from this order that the Petitioner now appeals.

**ANALYSIS**

On appeal, the Petitioner contends that he received ineffective assistance of counsel based on (1) trial counsel's failure to file a motion under Rule 608 of the Tennessee Rules of Evidence to impeach a witness for the State, (2) appellate counsel's failure to include the transcript of the motion to suppress on direct appeal; and (3) appellate counsel's failure to withdraw from representation in compliance with Rule 14 of the Tennessee Supreme Court thereby depriving the Petitioner of a timely application to appeal pursuant to Rule 11 of the Tennessee Supreme Court. The State responds that the Petitioner is not entitled to relief.

As an initial matter, in a footnote, the State urges this court to dismiss the Petitioner's appeal as untimely and argues that the interests of justice do not warrant waiver of the timely filing requirement. See Tenn. R. App. P. 4(a) (noting that "the notice of appeal required by Rule 3 shall be filed with the clerk of the appellate court within 30 days after the date of entry of the judgment appealed from; however, in all criminal cases the 'notice of appeal' document is not jurisdictional and the timely filing of such document may be waived in the interest of justice"); see also State v. Rockwell, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007) (quoting State v. Broyld, No. M2005-00299-CCA-R3-CO, 2005 WL 3543415, at *1 (Tenn. Crim. App. Dec. 27, 2005)) ("'In determining whether waiver is appropriate, this court will consider the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular case.'"). We acknowledge that the Petitioner's notice of appeal was untimely by one day and that he did not respond to the State's waiver argument in a reply brief or file a motion to waive the timely filing requirement. However, given that the notice of appeal was delayed by only one day, the seriousness of the conviction offenses in this case, and the nature of the issues presented, we conclude that the "interest of justice" is best served by granting a waiver in this case. See Dotson v. State, No. W2025-00406-

- 15 -

CCA-R3-PC, 2026 WL 36274, at *4 (Tenn. Crim. App. Jan. 6, 2026) (acknowledging the petitioner's failure to address the timeliness of his notice and waiving timeliness requirement given the constitutional nature of petitioner's claims and the fact that the delay was one day), perm. app. filed; Thomas v. State, No. E2021-01338-CCA-R3-PC, 2022 WL 16631309, at *4-5 (Tenn. Crim. App. Nov. 2, 2022) (waiver granted in the interest of justice where post-conviction appellant filed notice of appeal thirty-one days after post-conviction court entered order denying relief and appellant offered no explanation for the untimely filing or requested waiver of the notice of appeal filing requirement); State v. James, No. E2021-00559-CCA-R3-CD, 2022 WL 633540, at *1 (Tenn. Crim. App. Mar. 4, 2022) (declining to find the interest of justice mandated waiver where pro se defendant's notice of appeal was seventeen days late without requesting a waiver or providing an explanation for the untimely filing). Accordingly, we will review the issues presented in this appeal.

The following well-established law governs the Petitioner's ineffective assistance of counsel claims. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents a mixed question of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." Whitehead v. State, 402 S.W.3d 615, 621 (Tenn. 2013) (citing Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Calvert, 342 S.W.3d at 485). However, a post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)).

- 16 -

"Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." Whitehead, 402 S.W.3d at 621 (citing State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001)). "As a general matter, appellate courts must defer to a post-conviction court's findings with regard to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id. (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)).

To prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Id. at 370 (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

A defendant has a right to effective representation both at trial and on direct appeal. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995) (citing Evitts v. Lucey, 469 U.S. 387 (1985)). The test for ineffective assistance of counsel is the same for both trial and appellate counsel as the Strickland standard set forth above. That is, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." Id. at 597; see also Carpenter v. State, 126 S.W.3d 879, 886-88 (Tenn. 2004).

I. As his first claim, the Petitioner contends that trial counsel was ineffective in failing to file a motion under Rule 608 of the Tennessee Rules of Evidence to impeach Sergeant Kelly, the lead investigator and a witness for the State at the Petitioner's trial. Specifically, the Petitioner asserts that trial counsel "failed to pursue the proper notice to attempt to impeach Sergeant Kelly regarding his disciplinary record as well as his

- 17 -

character." The Petitioner also contends that the post-conviction court erred in determining that this issue had been previously determined on direct appeal and therefore waived under Tennessee Code Annotated § 40-30-106(h). The State responds that the Rule 608 issue has been previously determined by this court and cannot be "rehashed." In any case, the State maintains that the Petitioner is not entitled to relief because at the post-conviction hearing trial counsel testified that he had "a strategy to impeach Sergeant Kelly regarding his disciplinary record, but that the right opportunity never presented itself."

In denying this issue, the post-conviction court relied upon this court's ruling on direct appeal and determined that "this matter has already been ruled upon by the criminal court of appeals and requires no further ruling from this court." The Petitioner points out that this was error and we agree. Tennessee Code Annotated § 40-30-106(h) provides as follows:

> A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

Id., see e.g., Wells v. State, No. E2020-01278-CCA-R3-PC, 2021 WL 5811248, at *15 (Tenn. Crim. App. Dec. 7, 2021), perm. app. denied (Tenn. Mar. 23, 2022) (acknowledging that while on direct appeal, this court agreed with the State that the issue was waived, the post-conviction court erred in concluding that a similar issue had been previously determined). On direct appeal, the issue presented was whether the *trial court* erred by limiting the cross-examination of Sergeant Kelly, the lead investigator, and whether the *trial court* erred in not permitting trial counsel to question Sergeant Kelly about his disciplinary record. O'Neal, 2021 WL 3047340, at *8-9. In his petition seeking post-conviction relief and this appeal, the Petitioner contends *trial counsel* was ineffective in failing to file a Rule 608 motion pre-trial and provide the State with notice to question Sergeant Kelly about his disciplinary record. The former claim challenges the trial court's error, while the later stems from the Sixth Amendment and challenges trial counsel's failure to raise the same claim. Although these issues are similar, they are not the same. In addition, the Petitioner did not challenge trial counsel's failure to file a Rule 608 motion on direct appeal. Accordingly, this issue has not been previously determined as contemplated by Tennessee Code Annotated § 40-30-106(h).

While trial counsel's failure to file a Rule 608 motion prior to trial to impeach Sergeant Kelly was not previously determined, we affirm the post-conviction court's denial of this issue on other grounds. See e.g., State v. Hester, 324 S.W.3d 1, 21, n.9 (Tenn. 2010) (reviewing court may affirm a judgment on different grounds than those relied upon by the lower court when the lower court has reached the correct result). The record shows that

trial counsel made a strategic decision not to file a notice of intent to use Sergeant Kelly's disciplinary record for impeachment purposes. Based on his knowledge of Tennessee Rule of Evidence 608, trial counsel recognized that filing the required notice would have been futile because the conduct at issue was more than ten years old and therefore inadmissible. He believed his only viable option was to attempt to use the disciplinary record at trial if Sergeant Kelly "opened the door." Trial counsel testified that he attempted to use the records, but the trial court ruled the records were inadmissible because the conduct was more than ten years old. Under these circumstances, we conclude that trial counsel developed a reasonable, albeit unsuccessful strategy for attempting to admit the disciplinary record evidence, and this Court will not second-guess trial counsel's decision. See Alley v. State, 958 S.W.2d 138, 149 (Tenn. Crim. App. 1997) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982) ("[A reviewing] court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation."). The Petitioner has failed to prove that trial counsel's performance was deficient.

Even if trial counsel's failure to file a Rule 608 motion and provide the State with adequate notice was deficient, the Petitioner has not shown that the deficiency resulted in prejudice to his case. Here, the testimony of several witnesses and the Petitioner's co-defendant implicated the Petitioner in the shooting. O'Neal, 2021 WL 3047340, at *1-5. The Petitioner's co-defendant also testified that he and the Petitioner participated in the crime. Id. at *5. This testimony, alone, is sufficient to sustain the Petitioner's convictions. See Strickland, 885 S.W.2d at 87. The Petitioner is not entitled to relief on this issue.

II. Next, the Petitioner contends that appellate counsel was ineffective in failing to include the motion to suppress hearing transcript in the record on direct appeal and that the post-conviction court erred in concluding that the appropriate remedy for said error was to include the suppression hearing transcripts in the appellate record in his delayed application for permission to appeal to the Tennessee Supreme Court. Although it will have no impact on the determination of this appeal, for reasons that will be discussed in section III, we conclude that the post-conviction court's proposed remedy of a delayed appeal with the omitted transcript attached for review was improper. In response to the Petitioner's remaining claim, the State asserts that this issue is waived because the Petitioner failed to include the complete transcript of the motion to suppress hearing in the record on this appeal. Alternatively, the State contends that the Petitioner cannot establish that this failure resulted in prejudice.

As an initial matter, much of the confusion underlying whether the record contained the transcript from the motion to suppress hearing stems from the fact that the Petitioner was involved in a series of violent crimes and provided law enforcement officials with approximately five statements over the course of several days either admitting to his

involvement or implicating his codefendants. Although the Petitioner's statements pertained to different offenses and occurred on different dates and were given to two different detectives, there was only one hearing conducted to determine the admissibility of each of the Petitioner's statements. Consequently, the motion to suppress, labeled as Volume 3 and Volume 4 by the appellate court clerk, was broken into two parts and filed under separate case numbers. Volume 3, filed under trial court case number 15-05135, contained the first portion of the motion to suppress, detailed how law enforcement developed the Petitioner as a suspect, and included testimony pertaining to how the Petitioner's codefendant's statement was taken. A small portion of Detective Kelly's testimony pertaining to a statement the Petitioner provided in case number 15-05135 was also included in Volume 3. Volume 4, the only portion of the motion to suppress hearing filed in the record on appeal with the instant case, contained the second portion of Detective Kelly's testimony and included testimony of how the Petitioner's statement was taken in the case at bar.

In denying relief as to this issue, it is apparent from the record that the post-conviction court reviewed each volume of the transcript from the motion to suppress hearing, the motion to suppress, and the order of the trial court denying the same. Accordingly, we take judicial notice of these filings for our review of this issue. See Tenn. R. Evid. 201 (judicial notice); Bowley v. State, No. M2021-00390-CCA-R3-PC, 2022 WL 1436756, at *5 (Tenn. Crim. App. May 6, 2022) (taking judicial notice of the petitioner's direct appeal and reviewing the record from the direct appeal, the appellate brief submitted by trial counsel on the petitioner's behalf, and the State's brief and concluding that the petitioner failed to demonstrate prejudice from the absence of the hearing transcript from the appellate record).

In Tennessee, a post-conviction petitioner challenging appellate counsel's failure to include a suppression hearing transcript must prove by clear and convincing evidence both that the omission was objectively unreasonable and that the missing transcript would have changed the outcome on appeal. See e.g., Buford v. State, No. M2019-00424-CCA-R3-PC, 2020 WL 5668034, at *8 (Tenn. Crim. App. Sept. 24, 2020) (failure to include the transcript constitutes deficient performance as it falls below the range of competence expected of an appellate attorney, however, petitioner did not meet his burden of establishing that he was prejudiced by the failure); Moore v. State, No. E2019-01076-CCA-R3-PC, 2021 WL 4705190, at *19 (Tenn. Crim. App. Oct. 8, 2021) (appellate counsel's failure to prepare an adequate record on appeal constituted deficient performance but the petitioner failed to establish prejudice)(citing Beamon v. State, No. E2008-01138-CCA-R3-PC, 2009 WL 2922841, at *12 (Tenn. Crim. App. Sept. 14, 2009)); Grasty v. State, No. E2015-02075-CCA-R3-PC, 2017 WL 656905, at *17 (Tenn. Crim. App. Feb. 17, 2017) (failure to establish prejudice); Utley v. State, No. M1999-00560-CCA-MR3-PC, 2000 WL 374916, at *4 (Tenn. Crim. App. Apr. 7, 2000) (same); see also Tenn. R. App. P. 24 (b)

(noting that the burden is on the appellant to prepare a full and complete record for appellate review).

After determining that appellate counsel was deficient in failing to include the transcript from the suppression hearing in the record on direct appeal, the post-conviction court concluded that appellate counsel's error did not prejudice the outcome of the Petitioner's trial. Upon our review, the record shows that appellate counsel failed to include the transcript from the motion to suppress in the record on appeal, resulting in this court presuming the trial court order denying the motion to suppress was correct. Based on the above statutory and case authority, appellate counsel's failure to include the transcript in the direct appeal constitutes deficient performance. However, the Petitioner has failed to establish, or even argue, that the result of his direct appeal would have been any different if the transcript had been included. Instead, the Petitioner cites generally Volume 3 pages 8 through 61, which is the entirety of the motion to suppress transcript for the instant offense. This vague citation is not helpful in determining the grounds upon which the Petitioner relies for relief, especially given the fact that the motion to suppress hearing contains testimony from two detectives who collectively took five statements from the Petitioner while in custody over a period of days. Rule 10(b) of the Rules of this Court states plainly that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Based on the Petitioner's failure to comply with Rule 10(b), he has come perilously close to waiver of this issue.

In his brief to this court, the Petitioner lists factual assertions in support of why his statement should be suppressed. However, the Petitioner makes no legal challenge to the order of the trial court denying the motion to suppress. As he did in his direct appeal, the Petitioner primarily asserts that his statements were coerced by Sergeant Kelly, who allegedly refused to allow the Petitioner to have his attorney present during the interview despite the Petitioner's and his mother's repeated requests. In denying the Petitioner's motion to suppress, the trial court made findings of fact regarding each of the Petitioner's statements, and upon consideration of the applicable law, provided a detailed order reasoning, in pertinent part, as follows:

> Officer Perea and Sgt. Kelly both- testified that [Petitioner] was Mirandized in accordance with the law for each respective interview in which statements were obtained. Furthermore, [Petitioner] was afforded the opportunity to make changes to the statements prior to their finalization and [Petitioner] signing each statement, and on at least two occasions [Petitioner] used this opportunity to make hand-written changes to his statements. As testified to by both Officer Perea and Sgt. Kelly, [Petitioner] did not express a desire to terminate any interview, in which a statement was given,

prematurely nor did he request an attorney be present prior to or during the time statements were provided.

At the time [Petitioner] was <u>Mirandized,</u> he had the option to either exercise his right to remain silent and consult an attorney or waive those rights and speak to police, i.e. give statements. [Petitioner] chose to waive his Miranda rights and speak with police at the time each respective statement was given, as evidenced in the applicable Exhibits. Whether [Petitioner's] waiver is valid depends on the 1) voluntariness of his actions, subject to a determination based on the totality of the circumstances surrounding each waiver and 2) his awareness concerning the nature and consequences of his waiver. The totality of the circumstances in which [Petitioner] waived his <u>Miranda</u> rights suggests that each respective waiver was and is valid. There is a lack of evidence to suggest that [Petitioner] was unaware of the consequences of his actions when speaking to police and subsequently waiving his rights. The waivers signed by [Petitioner] all contain a clause informing [Petitioner] of [his] status as a suspect in the applicable crime — i.e. whether [Petitioner] was under arrest or not for the crime he was being questioned about. Therefore, upon signing the reading and the waiver, [Petitioner] would know whether he was free to leave and be aware of his rights regarding the situation before him. Furthermore, [Petitioner] was free to ask the interviewing officers any questions he had concerning the waiver of his rights and the potential consequences of his participation in the interview. The record does not show that [Petitioner] did not understand his rights and the situation, nor does it show that [Petitioner] took advantage of the opportunities at his disposal during the interviews.

[Petitioner] raises issue with the voluntariness of the statements he provided on a number of occasions. [Petitioner] alleges that he supplied statements to Officer Perea and Sgt. Kelly under the impression that he, [Petitioner], would be a witness for the state in testifying against any coconspirators. It is unreasonable, however, to reach this conclusion because no such promise was offered by either Officer Perea or Sgt. Kelly and no agreement, as reflected in the record, was reached to this effect. In all five (5) of [Petitioner's] statements as indicated in the applicable Exhibits, it states that [Petitioner] is "under arrest and may be charged" with the crime relating to the applicable interview. The record does not reflect, however, that Defendant raised issue with or had questions concerning how his statements were to be used at the time he gave each respective statement. Aside from [Petitioner's] unreasonable subjective belief, the totality of the circumstances in which his statements were taken does not suggest they were

given involuntarily or under false pretenses. Moreover, the record does not reflect that Officer Perea or Sgt. Kelly mistreated [Petitioner] in such a way that would be considered coercive. To the contrary, the record shows that [Petitioner] was treated properly and in accordance with the law. There is, therefore, insufficient evidence to support the suppression of [Petitioner's] statements due to the allegedly coercive acts employed by Officer Perea and Sgt. Kelly during their interviews with [Petitioner].

Upon review of the Petitioner's motion to suppress, the transcript from the hearing of the motion to suppress, and the trial court's order denying the same, we conclude that the evidence does not preponderate against the determination of the trial court. Accordingly, the Petitioner has failed to establish a reasonable probability that if the transcript of the suppression hearing had been included in the record on direct appeal, the result of the proceeding would have been different. He is not entitled to relief.

III. Finally, the Petitioner contends that appellate counsel's failure to withdraw from representation in compliance with Rule 14 of the Tennessee Supreme Court deprived him of a timely application to appeal pursuant to Rule 11 of the Tennessee Supreme Court. The Petitioner also asserts that the post-conviction court erred in concluding that a delayed application for permission to appeal to the Tennessee Supreme Court ("Rule 11 application") was the appropriate remedy for trial counsel's failure to either file the Rule 11 application or "withdraw as counsel so [the Petitioner] could file through another attorney or pro se." In response, the State agrees that the post-conviction court erred when it granted the Petitioner a delayed Rule 11 application because "[the] Petitioner filed a timely application for permission to appeal on September 20, 2021, which the Court denied on November 19, 2021." We agree with the State.

Post-conviction relief in the form of a delayed appeal is only appropriate when a petitioner has been "denied the right to appeal from the original conviction." Tenn. Code. Ann. § 40-30-113(a); see State v. Evans, 108 S.W.3d 231, 235-36 (Tenn. 2003); see also Tenn. Sup. Ct. R. 28, § 9(D)(1)(b). Tennessee Supreme Court Rule 28, section 9(D) permits a post-conviction court and this court to grant post-conviction relief in the form of a delayed appeal when a "petitioner, through no fault of his [or her] own, was denied second-tier review following [a] direct appeal." Stokes v. State, 146 S.W.3d 56, 59 (Tenn. 2004). The record shows that at the post-conviction hearing, appellate counsel testified, albeit in error, that he did not file a Rule 11 application. Based on this testimony, the post-conviction court determined that appellate counsel had not filed a timely Rule 11 petition on behalf of the Petitioner. However, as outlined above, the record clearly reflects that appellate counsel filed a timely Rule 11 application, which the Tennessee Supreme Court subsequently denied. Because trial counsel timely filed a Rule 11 application and the Tennessee Supreme Court considered and denied it, the Petitioner was not denied the

opportunity for second-tier review.  Although the post-conviction court erred in granting the Petitioner a delayed appeal to file a Rule 11 application, it does not affect the disposition of this appeal because the Tennessee Supreme Court has already denied the Petitioner's Rule 11 application.  With the issuance of this opinion, we reverse and vacate in part the portion of the post-conviction court's order granting a delayed appeal.

## CONCLUSION

For the aforementioned reasons, we reverse and vacate the judgment of the post-conviction court to the extent that it grants the Petitioner a delayed appeal.  In all other respects, we affirm the judgment of the post-conviction court.

s/ ***Camille R. McMullen***
CAMILLE R. MCMULLEN, JUDGE